**MLC (BERMUDA) LTD., Plaintiff,**

v.

**CREDIT SUISSE FIRST BOSTON CORPORATION and Aaron Tighe, Defendants.**

**No. 98 Civ. 7585(JSR).**

United States District Court,
S.D. New York.

April 23, 1999.

Patricia Hewitt, New York, NY, for plaintiff.

Robinson B. Lacy, Edward A. Harris, New York, NY, for defendants.

### MEMORANDUM ORDER

RAKOFF, District Judge.

While the pleadings in this case are somewhat obscured by an effusion of acronyms, the essential allegations of the Amended Complaint—taken as true for the purpose of deciding the defendants' instant motion to dismiss—are as follows. In the Spring of 1998, plaintiff MLC (Bermuda) Ltd. ("MLC") purchased certain derivative securities through its prime broker, defendant Credit Suisse First Boston Corp. ("CSFBC"), in a transaction handled by CSFBC employee defendant Aaron Tighe. *See* Amended Complaint ¶¶ 13–16. The derivatives consisted of two sets of notes (collectively "the Notes") issued by Credit Suisse First Boston ("CSFB"), a Swiss corporation affiliated with defendant CSFBC, namely, the "Tatneft Notes," *i.e.*, Zero Coupon Tatneft Credit Linked Notes due August 18, 1998, Series EM 399, which were linked to loans made to A.O. Tatneft, a Russian oil company, by the "CSFB Group,"[1] and the "GKO Notes," *i.e.*, Zero Coupon Russian Federation GKO Credit and Convertibility Linked Notes due October 6, 1998, Series EM 438, which were linked to certain treasury bills issued by the Ministry of Finance in Russia. *See id.* ¶¶ 13–14, 17, 20.

Following the purchases, and for the purpose of financing them, MLC resold the Notes to Credit Suisse First Boston (Europe) Ltd. ("CSFBEL"), another affiliate of defendant CSFBC, and entered into two repurchase agreements (the "Tatneft Repo Agreement" and the "GKO Repo Agreement") pursuant to which it agreed to repurchase the Notes from CSFBEL at set prices on dates certain. *See id.* ¶¶ 39–40. The respective obligations of MLC and CSFBEL under these "repo" agreements were governed by a Global Master Repurchase Agreement (the "GMRA"), which defined certain "Events of Default" and established the rights and remedies of the parties upon the occurrence of an Event of Default. *See id.* ¶¶ 41–42.

On September 24, 1998, CSFBEL sent MLC two letters, claiming, in the first that MLC had failed to pay certain amounts owed under the Tatneft Repo Agreement and, in the second, that MLC had failed to meet a margin call relating to the GKO Notes. *See id.* ¶¶ 62, 69. On September 25, 1998, CSFBC liquidated MLC's accounts, *see id.* ¶ 75, and CSFBEL commenced an action against MLC in the Commercial Court of the High Court of Justice in London, asserting, among other things, that MLC had breached the GMRA. *See* Declaration of Kevin Lester Studd ("Studd Decl.") Ex. 1, Writ of Sum-

---

**1.** The "CSFB Group," as defined by the plaintiff, includes Credit Suisse First Boston (Europe) Ltd. ("CSFBEL"), Credit Suisse First Boston ("CSFB"), defendant Credit Suisse First Boston Corporation ("CSFBC"), and certain other related entities. *See* Amended Complaint ¶ 4.

mons. A month later, on October 26, 1998, MLC filed this action against CSFBEL, CSFB, and CSFBC, alleging, *inter alia,* that the defendants had fraudulently induced it to purchase the Notes and wrongfully liquidated its accounts. *See* Complaint.

Shortly thereafter, on November 5, 1998, CSFBEL applied for leave to amend the London action to join CSFBC and CSFB as plaintiffs seeking a declaration of non-liability in connection with the liquidation of MLC's account. CSFBEL also sought an anti-suit injunction prohibiting MLC from prosecuting the instant action on the ground that filing suit in New York violated the terms of the written purchase agreements relating to the Notes. The Commercial Court granted the motion to amend and issued a limited anti-suit injunction that prohibited MLC from pursuing its claims against CSFBEL in the instant action but permitted it to pursue its claims against CSFB and CSFBC. *See* Affidavit of James Nicholas Denham Ex 2, Order of the Commercial Court dated Dec. 21, 1998 ¶ 3. In response, MLC filed an Amended Complaint in this action, eliminating CSFBEL (and CSFB) as parties but joining defendant Tighe. *See* Amended Complaint.

■ The remaining defendants, CSFBC and Tighe, then moved to dismiss on grounds of deference to a pending foreign action,[2] forum non conveniens, failure to state a claim, and failure to join an indispensable party. On March 10, 1999, following review of the parties' written submissions and oral arguments, the Court telephonically advised the parties that the defendants' motion to dismiss would be granted on the basis of deference to the pending London action. This Memorandum Order will serve to confirm that ruling and briefly state the reasons therefor.

**2.** Although the defendants refer to this argument as "comity," that term actually refers to deference to another sovereign's definitive law or judicial decision—not deference to a pending action in which no decision has yet been rendered. *See Dragon Capital Partners,*

■ "A court has inherent power to dismiss or stay an action based on the pendency of a related proceeding in a foreign jurisdiction." *Evergreen Marine Corp. v. Welgrow Int'l, Inc.,* 954 F.Supp. 101, 103 (S.D.N.Y.1997); *In re Houbigant,* 914 F.Supp. 997, 1003 (S.D.N.Y.1996); *Ronar v. Wallace,* 649 F.Supp. 310, 318 (S.D.N.Y.1986); *see also Landis v. North American Co.,* 299 U.S. 248, 254–55, 57 S.Ct. 163, 81 L.Ed. 153 (1936). In determining whether to grant a dismissal in deference to a pending foreign action, a court will consider such factors as the similarity of parties and issues, the adequacy of the alternative forum, the convenience of the parties, the promotion of judicial efficiency, the possibility of prejudice, and the temporal sequence of filing. *See Evergreen,* 954 F.Supp. at 103 *citing Caspian Investments, Ltd. v. Vicom Holdings, Ltd.,* 770 F.Supp. 880, 884 (S.D.N.Y.1991); *see also Boushel v. Toro Co.,* 985 F.2d 406, 410 n. 2 (8th Cir.1993). Applying these factors to instant case, the Court concludes that dismissal in favor of the London action is warranted.

■ *First,* as to parties and issues, there is a substantial and potentially complete identity of parties in the two actions. With the exception of Aaron Tighe, each of the parties before this Court is currently a party to the London suit. Tighe, moreover, has now consented to the jurisdiction of the Commercial Court for the purposes of allowing MLC to assert against him in London the very claims it has asserted against him in this Court. *See* Declaration of Aaron Tighe ¶ 11. Since MLC has not raised any other obstacles to Tighe's joinder in the London action, it appears that all of the parties in the instant action may be brought before the Commercial Court.

*L.P. v. Merrill Lynch Capital Services Inc.,* 949 F.Supp. 1123, 1126 n. 8 (S.D.N.Y.1997); *Advantage Int'l Management, Inc., v. Martinez,* No. 93 Civ. 6227, 1994 WL 482114, *4 n. 2 (S.D.N.Y. Sept.7, 1994).

*See Evergreen,* 954 F.Supp. at 104 (defendant's consent to jurisdiction favors dismissal where it creates potential for complete identity of parties between the two actions).

There is also a substantial identity of issues between the two lawsuits. Both cases arise from the same set of transactions, and the essential controversies are squarely before the British court. For example, MLC, in advancing its claims of fraud and negligent misrepresentation in this action, relies on a series of allegedly false representations made by the defendants. *See, e.g.,* Amended Complaint ¶¶ 21–30. The very same representations are an integral part of the London action. They are relied upon both as a "point of defence"—specifically, as a ground for rescission of the repo agreements pursuant to which CSFBEL filed suit—and as the basis for asserting a counterclaim against CSFBEL for damages resulting from fraudulent or negligent misrepresentation. *See* Studd Decl. Ex. 6, Points of Defence and Counterclaim ¶¶ 14–22, 52.[3]

MLC's instant claims that the liquidation of its accounts was wrongful are also before the British court. MLC asserts in both actions that CSFBC's liquidation of the accounts constituted a breach of its brokerage contract with CSFBC (the "Customer Agreement"). *Compare* Amended Complaint ¶¶ 116–19 *with* Points of Defence and Counterclaim ¶¶ 42, 56. And in both actions, it attempts to recover (albeit from different parties) damages allegedly caused by the liquidation. *Compare* Amended Complaint ¶¶ 116–19 *with* Points of Defence and Counterclaim ¶¶ 42, 56. Thus, the British court has been asked to address the same allegations of fraud, negligent misrepresentation, and breach of the Customer Agreement raised in the instant lawsuit.

Indeed, the primary difference between this action and the London action is simply in the way that MLC frames its claims. While, for example, MLC's allegations of fraud and negligent misrepresentation form a basis in this action for seeking to impose direct liability on Tighe and CSFBC, they form a basis in the London action for imposing vicarious liability on CSFBEL, on the theory that CSFBEL is responsible for the misrepresentations of Tighe and CSFBC. *Compare* Amended Complaint ¶¶ 82–115 *with* Points of Defence and Counterclaim ¶ 52. Similarly, while MLC in this action sues CSFBC directly for breach of contract, in the London suit it seeks instead to impose liability on CSFBEL for its role in inducing the breach by CSFBC. *Compare* Amended Complaint ¶¶ 116–19 *with* Points of Defence and Counterclaim ¶ 42, 55–56. To the extent that MLC raises the issue of breach against CSFBC in the London action, it does so "by way of defense only to [CSFBC's] claim for a declaration of non-liability." Points of Defence and Counterclaim ¶ 42.

In these and other respects, the differences between the two actions are differences of form and not of substance. Moreover, the differences are largely the product of MLC's own choices—its attempt to distinguish this action from the London suit by refusing to pursue CSFBC in London and instead pleading that it will pursue its affirmative claims against CSFBC "in the New York proceedings." Points of Defence and Counterclaim ¶ 42–43. Such artful pleading cannot obscure the overwhelming identity of issues in the two actions. To the extent that differences exist simply because the precise causes of action asserted in New York differ somewhat from the precise claims asserted in London, such differences are of little import in this analysis, since "parties and claims need not be identical in order for one action to be stayed or dismissed in deference to an earlier action." *Caspian,*

---

**3.** In the British pleadings, CSFBC is referred to as "CS US," CSFBEL is referred to as "CS Europe," and CSFB is referred to as "CS Switzerland." *See* Points of Defence and Counterclaim ¶ 1.

770 F.Supp. at 884, *citing Landis*, 299 U.S. at 254, 57 S.Ct. 163.

*Second*, the Commercial Court is clearly an adequate forum to resolve MLC's claims. The competence of British courts to adjudicate commercial disputes is beyond question. *See, generally, M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972); *Richards v. Lloyd's of London*, 135 F.3d 1289, 1296 (9th Cir.1998) (British courts provide adequate relief in cases of fraud, negligent misrepresentation and breach of fiduciary duty), *cert. denied* —— U.S. ——, 119 S.Ct. 365, 142 L.Ed.2d 301 (1998); *Haynsworth v. The Corporation*, 121 F.3d 956, 969 (5th Cir.1997) (same); *Allen v. Lloyd's of London*, 94 F.3d 923, 929 (4th Cir.1996) (same); *British Midland Airways Ltd. v. International Travel, Inc.*, 497 F.2d 869, 871 (9th Cir.1974).

More generally, a forum will be considered adequate if two requirements are met: "(1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Capital Currency Exchange*, 155 F.3d 603, 609 (2d Cir.1998) (internal citations and quotation marks omitted). Given that CSFBC is a party to the London action and Tighe has consented to jurisdiction in the Commercial Court, the first of these requirements is satisfied. As to the second requirement, while MLC complains about the British courts' more limited discovery, constraints on cross-examination, absence of civil juries, and lack of punitive damages remedies, *see* Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss on Grounds of Comity and Forum Non Conveniens, at 10, *citing* Affidavit of Richard Stanley Salter ¶¶ 6–8, these differences—or, as some might argue, improvements—do not render the London forum "inadequate" within the meaning of the law. *See, e.g., Piper Aircraft v. Reyno*, 454 U.S. 235, 247, 254, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981) (differences in substantive law, such as differences in amount of damages available, do

not render forum inadequate); *Scottish Air Int'l v. British Caledonian Group, PLC*, 81 F.3d 1224, 1234 (2d Cir.1996); *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 829 (2d Cir.1990); *Manela v. Garantia Banking Ltd.*, 940 F.Supp. 584, 591 (S.D.N.Y.1996) (unavailability of U.S. style discovery insufficient to render forum inadequate); *Shields v. Mi Ryung Constr. Co.*, 508 F.Supp. 891, 895 (S.D.N.Y.1981) (stating that "some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate").

*Third*, London is the most convenient forum. While important events at the heart of MLC's fraud and contract claims—such as the making of the alleged misrepresentations and the liquidation of MLC's accounts—took place in New York, a preponderance of the key documents and witnesses are located in London. These include, *inter alia*, the CSFB Group employees in London who were responsible for structuring the Notes, and drafting most of the documents relating to their sale, *see* Studd Decl. ¶ 5; a number of the individuals responsible for conducting discussions with Tatneft on behalf of the CSFB Group (the others are located in Moscow), *see id.* ¶ 12; the CSFBEL employees responsible for demanding payment of the repurchase price due under the Tatneft Repo Agreement, calculating the margin calls on the GKO Notes, and ordering CSFBC to liquidate MLC's accounts, *see* Studd Decl. ¶¶ 7, 8, 10; and the papers relating to the valuation of the Notes at the time of liquidation, *see* Pl. Forum Br. at 14. Moreover, even assuming *arguendo* that the witnesses and documents in New York were more critical, the balance would still tip sharply in favor of London because of the inconvenience and expense to the parties of litigating two actions involving the same subject matter in different forums. Accordingly, since the London action will proceed in any event, it is clear that the convenience of

the parties will best be served by dismissing this case and allowing all claims to be resolved in Britain.

*Fourth,* dismissal will likewise promote judicial economy. Where a single court is capable of fairly and competently adjudicating an entire controversy, there is little reason to divide the task between two courts.

 *Fifth,* MLC will not be prejudiced by the dismissal in any properly cognizable way. To be sure, MLC will have to forego litigating in its chosen forum, but a plaintiff's choice of forum is entitled to much less weight when it is made after the filing of a concurrent action arising out of the same series of transactions. *See, e.g., Buell v. Mildworm,* No. 97 Civ. 8449(DLC), 1998 WL 63402, *3 (S.D.N.Y. Feb.17, 1998); *cf. 800–Flowers, Inc. v. Intercontinental Florist,* 860 F.Supp. 128, 131–2 (S.D.N.Y.1994).

*Sixth,* and relatedly, any reasonable analysis of the sequence in which the two actions were filed reveals that the London suit has priority. CSFBEL commenced the London action on September 25, 1998, *see* Studd Decl.Ex. 1, Writ of Summons, more than a month before MLC filed suit in this court, *see* Complaint. While MLC argues that commencement of the London action should really be measured from the date the amended claims were filed—because only then did CSFBC become a party to the action—in actuality MLC knew from the moment the Writ of Summons was served that most of the allegations that it subsequently raised in its suit here would be addressed in the previously-filed London action.[4]

Having reviewed each of the relevant factors and concluded that each weighs in favor of dismissal, the Court finds that deference to the London action is appropriate. Accordingly, this action is hereby dismissed contingent upon defendant Aaron Tighe's consent to jurisdiction in the Commercial Court of the High Court of Justice in London.

Clerk to enter judgment.

SO ORDERED.

---

4. While plaintiff also argues that even if the London action were filed first deference to it is inappropriate because it has not progressed beyond incipiency, the argument proceeds from a flawed premise. Since the defendants in London have filed answers and counterclaims and the Commercial Court has been called upon to interpret forum selection provisions in the written purchase agreements relating to the notes, it is clear that the London action has progressed well beyond incipiency. *See Brinco Mining Ltd. v. Federal Ins. Co.,* 552 F.Supp. 1233, 1241 (D.D.C.1982) (action has progressed beyond incipiency where most parties have filed answers).